IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JAMES LAMONT BALDWIN,

     Petitioner,

  v.

DERRAL ADAMS,

     Respondent.

_____/

No. C 09-4749 CW

ORDER GRANTING
PETITION FOR WRIT
OF HABEAS CORPUS
AND DENYING MOTION
FOR EVIDENTIARY
HEARING AS MOOT

On October 6, 2009, Petitioner James Lamont Baldwin, with the assistance of an attorney, filed this petition for a writ of habeas corpus to vacate his conviction after a trial by jury.  On January 11, 2011, Respondent filed an answer.  On March 25, 2011, the Court granted Petitioner's motion for appointment of counsel. On July 16, 2011, Petitioner, represented by counsel, filed a traverse and moves for an evidentiary hearing to be held in the event the petition is not granted.

Having considered all the papers filed by the parties and the state court record, the Court grants the petition and denies the motion for an evidentiary hearing as moot.

BACKGROUND

On July 22, 2004, a jury found Petitioner guilty of first degree murder and being a felon in possession of a firearm.  The jury also found true an enhancement allegation that Petitioner had discharged a firearm causing great bodily injury.  Petitioner waived a jury trial on a prior prison term allegation.  The court found the allegation true, but later granted the prosecutor's

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

motion to strike it.  On August 27, 2004, the court denied
Petitioner's motion for a new trial and sentenced him to a prison
term of twenty-five years to life for first degree murder and a
consecutive term of twenty-five years to life for the firearm use.

On October 5, 2007, the California court of appeal affirmed
Petitioner's conviction.  <u>People v. Baldwin</u>, No. A107665 (Cal.
App. filed Oct. 5, 2007) (unpublished).  On January 23, 2008, the
California Supreme Court issued a one-sentence denial of review.
On May 9, 2009, Petitioner filed a petition for a writ of habeas
corpus in the California Supreme Court.  On August 29, 2009, the
Court issued a one-sentence denial.

The following is a summary of facts taken from the findings
of the state court of appeal and from the evidentiary record.

On July 1, 2002, the Oakland police found the body of Terrill
Zachery lying between two parked cars on 91st Avenue between A and
B Streets.  He had been shot five times, twice to the back of the
head and three times to the back of the lower torso.  The murder
weapon was a .40 caliber Glock pistol.  All nine .40 caliber shell
casings found at the scene came from a single gun.

Sergeant Brian Medeiros, of the Oakland Police Department's
homicide unit, was assigned to the case.  There were no leads in
this case until September 10, 2002, when Wesley Tucker was
arrested standing near a car containing illegal drugs.  To avoid
being returned to custody, Tucker offered to provide information
about Zachery's murder.  Tucker identified Petitioner as the
person who shot Zachery and said that Erik Gaines had driven
Petitioner to the scene of the murder.  Tucker was released

**United States District Court**
For the Northern District of California

1  without being charged with a crime.  Reporter's Transcript (RT) at

2  212.

3       After obtaining this information from Tucker, Sergeant

4  Medeiros decided to conduct a search of the home of Mocha

5  Aldridge, Petitioner's girlfriend, where Petitioner resided.

6  Sergeant Medeiros explained the search as a parole search, without

7  mentioning the murder, so as not to alert Petitioner that he was

8  the target of a murder investigation.  The search took place on

9  September 20, 2002.  The officers found a small amount of

10 marijuana in a shoe box and a dreadlock wig.  They arrested

11 Petitioner for marijuana possession and his parole was revoked.

12      Because Tucker had told Sergeant Medeiros that Gaines had

13 been with Petitioner on the night of the shooting, Sergeant

14 Medeiros put out a bulletin within the Oakland Police Department

15 that he wanted to talk to Gaines as a witness to the Zachery

16 murder.  On October 22, 2002, an officer located Gaines and

17 brought him to the police department on an outstanding warrant.

18 After Sergeant Medeiros asked Gaines what he knew about Zachery's

19 murder, Gaines said that he would tell Sergeant Medeiros what he

20 knew about the murder, but he would not sign papers or allow his

21 statement to be recorded because he was afraid of Petitioner's

22 family.  Sergeant Medeiros surreptitiously taped the interview.

23      Gaines said that, shortly before the shooting, he and

24 Petitioner were cruising the neighborhood in Gaines' car.  They

25 passed Zachery on 91st Avenue and A Street and Petitioner said,

26 "[T]hat's that [person who] killed T."  Zachery was talking to

27 Randy "Bone" Hicks, and Jermaine Fudge and Reggie Brown were

28 standing nearby.  Petitioner, who was wearing a black hoodie and

3

**United States District Court**
For the Northern District of California

jeans, told Gaines to drive around the block and let him out.  As
Petitioner got out of the car, he put on a braided wig.  Gaines
also noticed Petitioner had the .40 caliber pistol that he
regularly carried.  Gaines drove away, but then headed back to
91st Avenue.  When he got to 91st Avenue and D Street, he saw
Hicks and Fudge running and picked them up in his car.  Hicks told
him that Petitioner walked up to Zachery with his gun out and,
when Zachery started to run, Petitioner shot him in the back
several times.  Zachery fell and Petitioner stood over him and
"let him have it."  Gaines said that Hicks told him he was scared
because he had come face to face with Petitioner right after the
shooting, and that Fudge and Brown were also afraid that
Petitioner would "try to kill them."

   Gaines saw Petitioner about an hour and a half later at 90th
Avenue and East 14th Street.  Petitioner had changed his clothes.
Gaines complained to Petitioner that he had made his car "hot" by
shooting Zachery.  Petitioner said that no one would connect
Gaines' car to the murder.  Petitioner said he killed Zachery
because Zachery had killed "Little T" and it was "murder for
murder."

   On November 2, 2002, the gun that killed Zachery was
retrieved by Leonard Montalvo, a security guard at a low income
housing project.  Montalvo and his partner were on patrol in their
car on South Elmhurst at D Street in Oakland.  An African American
male saw them, ran from them and climbed a fence to get away.  As
he was climbing the fence, his jacket got caught in the fence and
came off as he fell to the other side.  Under the jacket, Montalvo
and his partner found a Glock .40 caliber firearm, which they

**United States District Court**
For the Northern District of California

turned over to the Oakland Police Department.  RT 659-665.
Montalvo described the person who dropped the gun as a tall, lanky
African American male of about nineteen years of age.[1]  RT 665.

Murder charges against Petitioner were filed in April 2003.

Before Gaines testified at Petitioner's preliminary hearing,
the deputy district attorney told him his statement had been taped
and Gaines expressed concern about this.  He also expressed
concern about who would be in the courtroom at the preliminary
hearing.  The deputy district attorney told him that Petitioner
and several members of his family were present, and Gaines said he
was afraid to testify.  When Gaines took the stand at the
preliminary hearing, he refused to answer questions.  The court
ordered him to reply, and he testified that, at the interview, he
told the police what he thought they wanted to hear so that he
could go home.  Gaines' taped interview was read as a prior
inconsistent statement.

A few months before Petitioner's trial, Hicks was killed.

I. Prosecutor's Case

A. Wesley Tucker's Testimony

At Petitioner's trial, Tucker testified as follows.  Prior to
the murder, Tucker and Petitioner had been friends for
approximately ten years.  On July 1, 2002, the day of the murder,
Tucker and his four-year-old son were leaving a baseball game at
the Coliseum when Petitioner called and asked Tucker to pick him

---

[1] Petitioner was described by Gaines, in his interview with
police, as approximately six feet, four inches tall and weighing
approximately 220 to 230 pounds.  Ex. 3 at 3:24-30.  Petitioner
was born on July 18, 1978, and he was almost twenty-four years old
at the time of the crime.  2 CT 319, Probation Report.

United States District Court
For the Northern District of California

up at the house of his girlfriend, Mocha Aldridge, who lived on 100th Avenue.  Tucker agreed, but first picked up his brother, Phil Jones, and his friend Aaron Thigpin.  Tucker then picked up Petitioner.  Tucker dropped his son off at his mother's house, then he and the others went to a liquor store near 90th Avenue and East 14th Street.  While riding in the car, Petitioner borrowed Tucker's cell phone to make several calls.  In one call, Petitioner told someone to meet him at 90th Street and bring "his 40," meaning his .40 caliber pistol.  Telephone company evidence showed that two calls were made that night from Tucker's cell phone to Aldridge's home phone number.  The first call was made at 9:16 p.m. and lasted two minutes; the second call was made at 11:59 p.m. and lasted one minute.  RT 1189; 1231.  The records did not indicate if the calls were answered by a person or by an answering machine.  RT 1231.

Petitioner and Jones got into an argument, during which a white Nissan Altima drove up with Tynesha Ross, another of Petitioner's girlfriends, in the back seat.  Petitioner went over to the car, leaned in and retrieved a gun.  After a few seconds, he turned around, walked over to Jones and punched him in the face.  Jones fled into a nearby liquor store, and Petitioner yelled at him to come back and fight.

Tucker tried to calm Petitioner.  However, others arrived, including Gaines, who urged him on.  Eventually Petitioner decided to go for a drive with Gaines.

Later that day, Tucker and Thigpin were standing at the corner of 90th Avenue and East 14th Street, when they heard a series of "pops" and saw Petitioner running up the street saying

someone was shooting at him.  Petitioner jumped into Tucker's car
and told him to take him to his brother Kenny's house on 71st
Avenue.  In the car, Petitioner told Tucker that he had "made"
Zachery because Zachery had killed Petitioner's friend, "Little
T."  Petitioner told Tucker that he had been riding in Gaines' car
and, when he saw Zachery, he got out of the car, ran up to Zachery
and shot him.  The only person who witnessed this was Hicks.
While he was driving with Tucker, Petitioner removed a .40 caliber
pistol from the pocket of his black hoodie.  When they reached
Petitioner's brother's house, Petitioner went inside and changed
into a Pendleton jacket and a Raiders hat.  Then, Tucker drove
Petitioner to a nearby gas station where Petitioner drove off with
another friend.

Tucker then drove to 91st Avenue to see if Petitioner's story
was true.  When he arrived, he saw that Zachery's body was lying
on the ground, that the police had blocked off the crime scene and
that Petitioner, Thigpen, Fudge and Brown were standing in the
crowd of onlookers.

After murder charges were filed against Petitioner and Tucker
had given his statement to the police, a person who was a friend
of both Tucker and Petitioner advised Tucker to leave town because
he was a witness to the murder.  Even though Tucker was on
probation for a prior drug felony in Alameda County, he moved to
Ohio because of the friend's advice.  Eventually, Tucker was
arrested on a drug charge in Ohio and returned to California for
violating his probation.  After Tucker was brought back to
California, someone told Tucker's friend, who was staying at

Tucker's daughter's house, that Tucker better not come to court to testify.

B. Erik Gaines' Statement

At Petitioner's trial, Gaines invoked his Fifth Amendment privilege not to testify.  The prosecutor moved to have Gaines' preliminary hearing testimony read to the jury, which included his taped statement to Sergeant Medeiros.  Defense counsel made an in limine motion to exclude the entirety of Gaines' statement on various grounds, but did not move particularly to exclude, on grounds of double hearsay, the part of Gaines' statement in which he reported that Hicks had told him he was afraid Petitioner would kill him because he witnessed Petitioner kill Zachery.  The judge allowed Gaines' entire statement to be read to the jury.

C. Petitioner's Phone Calls from Jail

While he was in jail for the marijuana charge and parole violation, Petitioner had several telephone conversations with Aldridge.  A large sign over the phone warned inmates that telephone calls were taped.  During two taped calls, Petitioner became angry at Aldridge and used pejorative language toward her. Petitioner told her that someone was "snitching," that he was being investigated by homicide officers and that he and Aldridge should leave town.  He also said that she could "have been gone too" and the authorities would offer her "low term 25."  At one point, Aldridge connected Petitioner to an unidentified third party and Petitioner instructed this person to "handle that shit," to "check your surroundings," and not to let anyone send him that "bizat," because "there's somebody in our circle snitching."

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    The prosecutor requested that the two taped calls, in their
2  entirety, be played for the jury.  Defense counsel moved to
3  suppress the tapes on several grounds, including California
4  Evidence Code section 352, which provides for the exclusion of
5  evidence if its probative value is outweighed by its prejudice.
6  After a hearing on the motion, the trial court admitted the entire
7  tape of the first telephone conversation.  The court redacted
8  portions of the second conversation, mostly on grounds of
9  redundancy.  RT 2-69.

10 II. Defense Case

11    A. Jermaine Fudge's Testimony

12    Fudge testified that, on the night of July 1, 2002, he was
13 hanging out with Hicks on 91st Avenue and saw Zachery walking down
14 91st Avenue, followed by another person wearing a black hoodie.
15 Fudge said the person was shorter and thinner than Petitioner.  He
16 saw the person in the black hoodie walk behind a van and start
17 shooting.  Then he and everyone else ran away.  Later, he and
18 Hicks were picked up by Gaines and they discussed why Zachery had
19 been shot, but Hicks never said he saw the killer.

20    B. Aaron Thigpen's Testimony

21    Thigpen also testified in Petitioner's defense.  He stated
22 that he, Tucker and Jones were driving around on the night of July
23 1, 2002.  He stated that Petitioner was never in the car with them
24 and he did not see Petitioner until later that week.  Later that
25 evening, while he was hanging out with Tucker around a liquor
26 store at 90th Avenue, they heard what sounded like firecrackers.
27 He walked up the street and came to the crime scene.  Thigpen
28 testified that Tucker and Petitioner had been good friends, but

United States District Court
For the Northern District of California

1  that they had had a falling out.  Tucker told Thigpen that he did

2  not like Petitioner, and wanted to "pay him back."

3      C. Germain Tapia's Testimony

4      Germain Tapia lived on 91st Avenue between A and B Streets.

5  He was located by the defense and subpoenaed to testify near the

6  end of the trial.  He testified that, on the night of July 1,

7  2002, he was working on a car at 91st Avenue and A Street.  At

8  11:00 p.m., he saw a person in a blue hoodie walk by.  Tapia could

9  not see his face, but he was shorter and skinnier than Petitioner

10 and walked with a limp.  A few minutes later Tapia heard

11 approximately ten shots.  He saw two men run past, and then he ran

12 inside his house.

13     D. Alibi Defense

14     Aldridge testified that she and Petitioner had arranged to go

15 to the home of Petitioner's mother, Deborah Baldwin, in Modesto on

16 June 30, 2002, the day before the murder.  Petitioner's mother

17 arrived in Oakland in a rented car to pick them up, but Petitioner

18 was out with friends and could not be located.  Aldridge drove to

19 Modesto with Petitioner's family, and returned later that evening

20 in the rented car to get Petitioner.  They arrived in Modesto late

21 that evening and stayed through the July 4th holiday.

22     Cecilia Franklin, a good friend of Deborah Baldwin's,

23 testified that she had seen Petitioner at Deborah Baldwin's house

24 on June 30th and July 1st.  Denise Pitts, another friend of

25 Deborah Baldwin's, testified that she recalled seeing Petitioner

26 at his mother's house the evening of July 1st.

27     Deborah Baldwin testified that she rented a car from

28 Enterprise Rent-A-Car in Modesto on June 30th, and drove to

United States District Court
For the Northern District of California

Oakland, arriving at noon.  Petitioner could not be found, so she drove back to Modesto with Aldridge.  Later that day, Deborah Baldwin let Aldridge take the car back to Oakland to pick up Petitioner.  Aldridge returned with Petitioner late that night and they stayed at Deborah Baldwin's house until the evening of July 4th.  On cross-examination, Deborah Baldwin acknowledged that she had been barred from renting from Enterprise since 2001 because of an outstanding debt and that Franklin had rented the car for her on June 28th.

Petitioner testified that he and Aldridge drove to his mother's house in a rented car, arriving in Modesto at 8:30 p.m. on June 30th, 2002, and that they stayed there until the evening of July 4th.  When Petitioner was asked about his taped jail phone conversations with Aldridge, he stated that he did not believe he was being investigated for murder, that his reference to "low term 25" in the call was not to the twenty-five-years-to-life sentence for murder, but was a reference to a twenty-five month term for a drug offense that Aldridge would have to serve if she was convicted and got the low term of three years for selling marijuana.  He also explained that his reference to "snitching" was in regard to his marijuana stash.  He stated that the third party on the phone was "Boo" or "Booby," that he and Boo had agreed to become partners in a record business, and that his directions to Boo to "handle that shit" and "check your surroundings" referred to record business arrangements.  He stated that his reference to a "b'zat" was not to a gun, but to cash that Boo owed him; he was telling Boo not to send the cash to Aldridge because he was concerned that she would spend it.

**United States District Court**
For the Northern District of California

Petitioner denied shooting Zachery and testified that he had no ill will towards him. He stated that he and Tucker had a falling out sometime before July 2002 because he had an affair with the mother of one of Tucker's children and had a fight with Tucker's brother, Jones.

III. Prosecutor's Rebuttal

Jason Tardiff, Enterprise's custodian of records, testified that a silver Pontiac Grand Am had been rented to Franklin on July 2, 2002 at 5:44 p.m., the day after the murder. The car was rented through August 12, 2002. Franklin had also rented a Toyota Camry on June 19, 2002, and returned it on June 24, 2002. The prosecutor asked Tardiff whether he had asked Tardiff to check all cars rented at all times in June and July 2002 by Franklin. RT 1152. Tardiff responded in the negative to this question, explaining that he had only been given two contract numbers to check. RT 1152. In his closing argument, the prosecutor stated that he had checked every car Franklin had rented, the one on June 19th and the one on July 2nd, and that she had rented nothing in between. RT 1235.

LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision

that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A decision is contrary to clearly established federal law if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result. Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003).

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is the holdings of the Supreme Court as of the time of the relevant state court decision. Williams v. Taylor, 529 U.S. 362, 412 (2000). Although a state court decision may no longer be overturned on habeas review simply because of a conflict with circuit-based law, circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." Clark, 331 F.3d at 1070-71.

To determine whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established law, a federal court looks to the decision of the highest state court that addressed the merits of a petitioner's claim in a reasoned decision. LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the state court only considered state

law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law.  Lockhart v. Terhune, 250 F.3d 1223, 1230 (9th Cir. 2001).

The standard of review under AEDPA is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim.  When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law.  Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

Even if the state court's ruling is contrary to or an unreasonable application of Supreme Court precedent, that error justifies habeas relief only if the error resulted in "actual prejudice."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). Thus, habeas relief is granted only if the state court's error had a "substantial and injurious effect or influence in determining the jury's verdict."  Id.

DISCUSSION

In his direct appeal in state court, Petitioner asserted the following claims: (1) the prosecutor engaged in numerous instances of misconduct, violating his due process rights to a fair trial; (2) the trial court abused its discretion under California Evidence Code section 352 by failing to redact further the recorded telephone calls between Petitioner and Aldridge,

United States District Court
For the Northern District of California

violating his due process rights to a fair trial;[2] (3) the trial court erred by admitting evidence of threats and violence against witnesses that were not made or instigated by Petitioner; (4) the trial court failed adequately to investigate juror misconduct; and (5) the cumulative effect of these errors deprived Petitioner of due process and a fair trial.  Petitioner also argued that defense counsel was ineffective.  In addition, Petitioner sought habeas relief in state court.  The only state court that issued a reasoned decision on these claims was the state court of appeal on Petitioner's direct appeal.

I. Prosecutorial Misconduct and Ineffective Assistance of Counsel

    A. Legal Standard

      A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." Darden v. Wainwright, 477 U.S. 168, 181 (1986).  Under Darden, the first issue is whether the prosecutor's conduct was improper; if so, the next question is whether such conduct infected the trial with unfairness.  Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005).

      Even if the prosecutor's actions constituted misconduct, when a curative instruction is issued, the court presumes that the jury has disregarded the misconduct and that no due process violation occurred.  Greer v. Miller, 483 U.S. 756, 766 n.8 (1987); Darden,

---

[2] In his traverse, Petitioner concedes this claim due to Alberni v. McDaniel, 458 F.3d 860, 865 (9th Cir. 2006), which held that AEDPA bars federal courts from entertaining such claims because "the Supreme Court has never expressly held that it violates due process to admit" propensity evidence, no matter how improper the use to which it is put.  Traverse at 67.  The Court, therefore, does not address this claim.

477 U.S. at 181-82 (the Court condemned egregious, inflammatory comments by the prosecutor but held that the trial was fair because curative instructions were given by the trial judge).

Other factors which the court may take into account in determining whether prosecutorial misconduct rises to the level of a due process violation are (1) the weight of the evidence of guilt, see United States v. Young, 470 U.S. 1, 19 (1985); (2) whether the misconduct was isolated or part of an ongoing pattern, see Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct related to a critical part of the case, see Giglio v. United States, 405 U.S. 150, 154 (1972); and (4) whether the prosecutor's comment misstated or manipulated the evidence, see Darden, 477 U.S. at 182.

To establish ineffective assistance of counsel, a petitioner must show that (1) counsel made errors so serious that counsel was not functioning as the counsel guaranteed a defendant by the Sixth Amendment, and (2) the deficient performance prejudiced the defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694 (1984).  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Loveland v. Hatcher, 231 F.3d 640, 644 (9th Cir. 2000) (citing Strickland, 466 U.S. at 687).

A difference of opinion as to trial tactics does not constitute denial of effective assistance, United States v. Mayo, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics

United States District Court
For the Northern District of California

are known to have been available, <u>Bashor v. Risley</u>, 730 F.2d 1228, 1241 (9th Cir. 1984).  Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances.  <u>Sanders v. Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir. 1994).  A label of "trial strategy" does not automatically immunize an attorney's performance from Sixth Amendment challenges.  <u>United States v. Span</u>, 75 F.3d 1383, 1389-90 (9th Cir. 1996).  For example, an attorney's misunderstanding of the law, resulting in the omission of his client's only defense, is not a strategic decision and amounts to ineffective assistance of counsel.  <u>Id.</u>; <u>see also</u>, <u>United States v. Alferahin</u>, 433 F.3d 1148, 1161-62 (9th Cir. 2006).

Counsel's decision not to request a limiting instruction on damaging evidence is within the acceptable range of strategic tactics employed to avoid drawing attention to damaging testimony. <u>Musladin v. Lamarque</u>, 555 F.3d 830, 845-46 (9th Cir. 2009). However, once the prosecutor draws the jury's attention to the damaging testimony in closing argument and asks jurors to draw the inference that a limiting instruction would have forbidden, the decision not to request a limiting instruction will not be shielded as within the range of reasonable strategy.  <u>Id.</u> at 847.

B. Analysis

Although the state appellate court ruled that the majority of Petitioner's prosecutorial misconduct claims were waived because defense counsel did not object, it addressed their merits to determine whether counsel's failure to object constituted

United States District Court
For the Northern District of California

ineffective assistance of counsel, stating that "if the [prosecutor's] challenged statement or argument was not misconduct then, of course, it would not be outside the range of competence for counsel to fail to object." People v. Baldwin, No. A107665, slip op. at 10 (Cal. App. October 5, 2007).

In his federal petition, Petitioner repeats the claims of prosecutorial misconduct and ineffective assistance of counsel. Respondent likewise argues here that most of the prosecutorial misconduct claims are forfeited because defense counsel failed to object to them at trial and the contemporaneous objection rule is an adequate and independent ground constituting a procedural bar to consideration of the issue. This Court addresses the merits of the prosecutorial misconduct claims because Petitioner may show cause for a procedural default by establishing constitutionally ineffective assistance of counsel and prejudice by demonstrating a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceedings would have been different. Murray v. Carrier, 477 U.S. 478, 488 (1986); Vansickel v. White, 166 F.3d 953, 958 (9th Cir. 1999). Petitioner must show that the result of the proceedings was fundamentally unfair or unreliable. Id. Like the state court, this Court will address the prosecutorial misconduct claims simultaneously with the ineffective assistance of counsel claims because, if the prosecutor did not commit misconduct, counsel's failure to object would not constitute ineffective assistance.

1. Appeal to Passion and Prejudice of Jury

Petitioner argues that the prosecutor improperly argued that the jury should convict him because his conviction would protect

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

the community by deterring future law-breaking and preserving civil order.

In his rebuttal closing argument, the prosecutor stated, "With this kind of evidence, if you find this defendant not guilty, I mean, it's almost like it's open season in East Oakland. This is what it is." RT 1249. Defense counsel did not object. The last words the prosecutor said in his rebuttal were:

> It's not a crusade against bad guys in Oakland. It is this case -- this is homicide in this case in this area, and this is the way it happens. If you permit him to get away with this, you know, it's essentially lawlessness out there. Don't subject the citizens. Don't send that message out there. Treat this case individually. This is our facts on this defendant. Understand the context.

RT 1249-50. Defense counsel did not object to this either.

A prosecutor may not urge the jurors to convict in order to protect community values, preserve civil order, or deter future law-breaking. United States v. Sanchez, 659 F.3d 1252, 1256 (9th Cir. 2011); United States v. Weatherspoon, 410 F.3d 1142, 1149 (9th Cir. 2005). The vice in such an argument is that it increases the possibility that the defendant will be convicted for reasons unrelated to his own guilt. Sanchez, 659 F.3d at 1257 (prosecutor committed misconduct in suggesting to jury that accepting defendant's duress defense would be tantamount to sending a memo to all drug couriers to use the duress defense and would lead to increased drug trafficking). In Weatherspoon, the prosecutor repeatedly stated in his closing argument that finding the defendant guilty of being a felon in possession of a weapon would protect individuals in the community. 410 F.3d at 1149. The court stated:

> That entire line of argument . . . was improper.  We
> have consistently cautioned against prosecutorial
> statements designed to appeal to the passions, fears
> and vulnerabilities of the jury. . . . Jurors may be
> persuaded by such appeals to believe that, by
> convicting a defendant, they will assist in the
> solution of some pressing social problem.  The
> amelioration of society's woes is far too heavy a
> burden for the individual criminal defendant to
> bear.

Id.

The state appellate court found that the prosecutor's remarks did not constitute misconduct.  The court reasoned that "the prosecutor himself undermined the prejudicial effect of these remarks by cautioning the jury that, 'It's not a crusade' and that it must '[t]reat this case individually.'"  People v. Baldwin, No. A107665, slip op. at 22.  The court also reasoned that the remarks would not have incited the jurors' passions because "the prosecutor's brief references to lawlessness and the need to send a message to the citizens of the community were preceded by lengthy and detailed argument focused entirely upon the evidence." Id. at 22-23.  Because the prosecutor's remarks were not misconduct, the court found that counsel's failure to object was not ineffective assistance.  Id. at 22.

Respondent relies on Donnelly v. DeChristoforo, 416 U.S. 637, 646-47 (1974), where the Court stated,

> A court should not lightly infer that a prosecutor
> intends an ambiguous remark to have its most
> damaging meaning or that a jury, sitting through a
> lengthy exhortation, will draw that meaning from the
> plethora of less damaging interpretations.

However, DeChristoforo is inapplicable here because the meaning of the prosecutor's remarks was clear and unambiguous.  The prosecutor's statements were improper and constituted misconduct.

United States District Court
For the Northern District of California

Defense counsel declares that he did not object because he viewed "this broad-based argument as generic rhetoric, and not particularly inflammatory. He was not arguing the evidence, just the implications of the jury's decision. It certainly was less objectionable than other things the prosecutor said." Petitioner's Ex. B, Declaration of Theodore Berry, trial counsel, at ¶ 16. Respondent argues that counsel's statement shows that he made a tactical decision not to object. To the contrary, defense counsel's statement shows that he failed to recognize the illegality and prejudicial effect of the prosecutor's statement.

Furthermore, the prosecutor's improper statements were made at the end of his rebuttal and so they were the last words that the jury heard. See Crotts v. Smith, 73 F.3d 861, 867 (9th Cir. 1996) (prejudicial evidence at end of trial without a limiting instruction magnifies the prejudicial effect because it is freshest in the mind of the jury), superseded by statute on other grounds as stated in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000). Because the prosecutor's statements appealing to the passions of the jury were likely to have a substantial prejudicial effect, defense counsel's failure to object constituted deficient performance. These facts support a finding of prosecutorial misconduct and ineffective assistance of counsel.

2. Threats and Violence Against Witnesses

Petitioner contends that the court erred by admitting evidence of threats and violence against witnesses. He also argues that the prosecutor committed misconduct by suggesting, despite the lack of evidence to support such a conclusion, that Petitioner was responsible for the threats and violence. He

**United States District Court**
For the Northern District of California

1   claims that defense counsel was ineffective in failing to object

2   and request curative instructions.

3       Under California law, absent evidence that the defendant made

4   or authorized threats to witnesses, the evidence of such threats

5   is inadmissible to prove consciousness of guilt.  People v. Terry,

6   57 Cal. 2d 538, 566 (1962).  However, California cases hold that

7   evidence that a witness is afraid to testify because he or she

8   fears retaliation is admissible as relevant to the credibility of

9   that witness.  People v. Burgener, 29 Cal. 4th 833, 869 (2003).

10  For this purpose, it is not necessary to link the threats to the

11  defendant.  People v. Gutierrez, 23 Cal. App. 4th 1576, 1588

12  (1994).  However, evidence of threats to witnesses can be highly

13  prejudicial because it appeals to the jury's sympathies, arouses

14  its sense of horror, provokes its instinct to punish, or otherwise

15  may cause a jury to base its decision on something other than the

16  evidence.  United States v. Thomas, 86 F.3d 647, 654 (7th Cir.

17  1996).  Furthermore, "threat evidence has extremely limited

18  probative value towards credibility, unless the evidence bears

19  directly on a specific credibility issue regarding the threatened

20  witness.  For example, threat evidence can be relevant to explain

21  a witness' inconsistent statements, delays in testifying, or even

22  courtroom demeanor indicating intimidation."  Id.

23          a. Threats Against Wesley Tucker

24      Petitioner points out that Tucker was permitted to testify to

25  threats that had been made by someone he did not identify.  The

26  prosecutor asked Tucker whether he was concerned that something

27  might happen to him in jail or that members of Petitioner's family

28  would hurt him or his family, and Tucker replied, "Yes."  RT 211-

12.  There was no evidence that Petitioner threatened Tucker or instigated any threats.  Trial counsel did not object or ask for a limiting instruction regarding the threat evidence.  Petitioner claims the trial court abused its discretion in admitting such prejudicial evidence.

The state appellate court denied the abuse of discretion claim on the ground that, although evidence of third-party threats was inadmissible to prove Petitioner's consciousness of guilt, it was admissible to show Tucker's state of mind, which was relevant to his credibility.  The state court also held that the abuse of discretion claim was waived because defense counsel did not request a limiting instruction and the trial court had no duty to give such an instruction without a request.

Citing Dudley v. Duckworth, 854 F.2d 967, 970, 972 (7th Cir. 1988) and Estelle v. McGuire, 502 U.S. 62, 75 (1991), Petitioner argues that the unrestricted admission of evidence that unnamed third parties had made threats against Tucker and his family, which allowed the prosecution to argue that Petitioner was "intimidating and terrorizing witnesses including to this day," so infused his trial with unfairness that it denied him due process of law.

In Estelle, the Supreme Court stated that due process guarantees "the fundamental elements of fairness in a criminal trial."  502 U.S. at 70.  However, the category of infractions that violate fundamental fairness is defined very narrowly and, beyond the specific guarantees in the Bill of Rights, the due process clause has limited application.  Id.

United States District Court
For the Northern District of California

In <u>Dudley</u>, the court stated that, although the admissibility of evidence is generally a matter of state law, a habeas claim may be stated where "an erroneous evidentiary ruling is of such magnitude that the result is a denial of fundamental fairness." <u>Id.</u> at 970.  In <u>Dudley</u>, the court concluded "that the evidence of threats was intended more to prejudice the defendants, including petitioner, than to explain away any nervousness of the witness." 854 F.2d at 972.  The court continued, "When the prejudicial effect of the testimony is weighed against its necessity, even assuming the witness's nervousness was extreme, . . . we find that the resulting prejudice mandates relief. . . . [W]e find that the trial court's ruling allowing the testimony to stand 'is of such magnitude that the result is a denial of fundamental fairness.'" <u>Id.</u>  Ninth Circuit authority is in accord.  <u>See</u> <u>Henry v. Kernan</u>, 197 F.3d 1021, 1031 (9th Cir. 1999).  In <u>Hayes v. Ayers</u>, 632 F.3d 500, 515 (9th Cir. 2011), the Ninth Circuit pointed out that, for purposes of habeas relief, <u>Dudley</u> is not federal law as determined by the Supreme Court of the United States.  However, the court stated that <u>Dudley</u> could be pertinent to habeas review to the extent it persuasively illuminated Supreme Court precedent.  <u>Id.</u>

In the Ninth Circuit, only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process.  <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 920 (9th Cir. 1991).  For instance, in <u>Alcala v. Woodford</u>, 334 F.3d 862, 887 (9th Cir. 2003), the court held that the admission of evidence that knives were found in the defendant's residence was a due process violation, where the jury could draw no permissible probative inference from it because the murder

weapon was a knife with a different design, which was sold
separately and was not owned by the defendant.

As noted, the state appellate court here concluded that the
trial court properly admitted the evidence of threats against
Tucker to show Tucker's state of mind, which it found relevant to
his credibility. <u>People v. Baldwin</u>, No. A107665, slip op. at 33.
The admission of the evidence of threats against Tucker was
prejudicial to Petitioner in that the jury was not instructed not
to consider it for the impermissible purpose of Petitioner's
consciousness of guilt, because there was no evidence that he was
responsible for the threats.  Without a limiting instruction, it
was likely the jury used the evidence for the improper purpose of
consciousness of guilt, rather than for the acceptable purpose of
Tucker's credibility.  Due to the highly prejudicial nature of the
evidence, its admission may have made it unlikely that Petitioner
received a fair trial.  However, because the jury could have used
the evidence to ascertain Tucker's credibility, the Court finds
that no due process violation occurred.  Nonetheless, as discussed
below, the admission of this evidence without a limiting
instruction and the prosecutor's exploitation of it contribute to
the finding of ineffective assistance of counsel.

Petitioner also argues here, as he did in his state habeas
petition, that counsel's failure to request a limiting instruction
as to Tucker's threats testimony constituted deficient
performance.[3]  In his declaration, defense counsel states that "it

---

[3] Because this claim was raised only in the state habeas
petition, the state appellate court did not address it on
Petitioner's direct appeal.  Thus, there is no reasoned state
court opinion addressing this claim.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  would have been appropriate to request that the evidence be

2  limited [to the witness's state of mind], but the overall

3  significance of the failure to limit the use of the evidence is,

4  in my opinion, of little value." Berry Dec. at ¶ 7. Respondent

5  argues that counsel's statement shows that his failure to request

6  a limiting instruction was a strategic decision to avoid

7  attracting attention to the evidence. To the contrary, counsel

8  concedes that it would have been appropriate to seek an

9  instruction and indicates that he failed to ask for it, not to

10 avoid attracting attention to the evidence, but because he thought

11 limiting instructions were of little value or perhaps that the

12 evidence was of limited value to the prosecution.

13     Given the prejudicial effect of threat evidence, and the fact

14 that courts have recognized the value of instructions limiting how

15 threats can be used as evidence, counsel was incorrect. This

16 claim supports a finding of ineffective assistance of counsel.

17           b. Evidence of the Killing of Randy Hicks

18     In a taped statement that was admitted at trial, Gaines

19 stated that, immediately after the shooting, Hicks told him that

20 Petitioner shot Zachery, that he was standing near Zachery when he

21 was shot, and that he was afraid Petitioner might shoot him, too,

22 because he was a witness. The court allowed testimony from other

23 witnesses that Hicks had been killed a few months before

24 Petitioner's trial. Petitioner argues that the trial court erred

25 by: (1) admitting evidence of Hicks' statement to Gaines because

26 it was double hearsay and prejudicial and (2) allowing evidence

27 that Hicks was killed before the trial because it was unconnected

28 to Petitioner and was prejudicial. Petitioner also argues

ineffective assistance of counsel in that his attorney failed to offer evidence that Hicks' testimony would have exculpated Petitioner, so there would have been no reason for Petitioner to have had Hicks killed.

(1) Gaines' Taped Statement

The state appellate court held that Gaines' taped statement to the police was admissible because Gaines had invoked his Fifth Amendment privilege at trial, the prosecutor properly introduced Gaines' preliminary hearing testimony[4] and the taped police interview had been admitted at the preliminary hearing as a prior inconsistent statement.

In his declaration, Petitioner's trial counsel states:

> Although I made an in limine motion to exclude the entirety of Gaines' taped statement on various grounds, I did not specifically object to the introduction of the hearsay statements which Gaines claimed had been made to him by Randy Hicks. It now seems clear to me that the taped statement could have been subject to a motion to have them redacted; I don't know why I did not request that at the time.

Berry Dec. at ¶ 13.

Respondent argues that any hearsay objection by defense counsel to Gaines quoting Hicks' statement that Petitioner had killed Zachery and that Hicks was in fear for his life would have been overruled by the court because Hicks' statement was

---

[4] California Evidence Code §§ 1291 and 1294 provide that a witness's preliminary hearing testimony, including a prior inconsistent statement, is not made inadmissible by the hearsay rule if the witness is unavailable at trial.

United States District Court
For the Northern District of California

admissible under the spontaneous declaration exception to the hearsay rule in California Evidence Code § 1240.[5]

Hicks' reported statement was double hearsay and does not appear to qualify as a spontaneous statement.  His statement that Petitioner had killed Zachery was extremely prejudicial.  His statement that he was in fear of his life was not probative of anything because it could not be used to prove Petitioner's consciousness of guilt and, because Hicks did not testify, it had no probative value regarding Hicks' credibility.  Although the state court ruled that evidence of Hicks' murder was relevant to other witnesses' states of mind, because of the extreme prejudice resulting from Hicks' hearsay statement, counsel's failure to object to that portion of Gaines' interview or to request a limiting instruction regarding it, supports a finding of deficient representation.

### (2) Evidence That Hicks Was Killed

Evidence that Hicks had been killed was introduced through the testimony of two witnesses.  In response to the prosecutor's questions, and over defense counsel's objection of irrelevance, which was overruled, Sergeant Medeiros testified that Hicks was killed on February 4, 2004, in East Oakland, a five minute drive from where Zachery was killed.  RT 739.  In response to the prosecutor's question, Fred Martin, a friend of Zachery's, testified that he knew that Hicks had been killed.  RT 304.

---

[5] California Evidence Code section 1240 provides that a statement is not made inadmissible by the hearsay rule if it purports to narrate, describe or explain an event perceived by the declarant and was made spontaneously while the declarant was under the stress of excitement caused by such perception.

United States District Court
For the Northern District of California

In his closing, the prosecutor stated:

> And I think there was testimony regarding Bone
> [Hicks] is the only one that saw it.  And Bone saw
> this and Bone knows who killed him.  Bone knows the
> defendant did this.  Bone was killed, shot to death.
> You don't think--you don't think these witnesses
> currently here know this?  This is admissible for
> state of mind of these witnesses.

RT 1185.

The state appellate court held that the claim that the trial court erred by allowing witnesses to testify that Hicks had been killed was waived because defense counsel failed to object.  In denying the claim of prosecutorial misconduct, the court found that the prosecutor, in his closing argument, specifically stated that the witnesses' awareness that Hicks had been killed was relevant to their state of mind and he did not imply that Petitioner had been involved in the killing of Hicks.

Nonetheless, the implication of the prosecutor's statement was that Hicks was killed because he knew that Petitioner killed Zachery and Petitioner must have been involved in causing Hicks' death.  A limiting instruction was necessary to prevent the jury from making this inference.  It is not at all clear whether the jurors' knowledge of Hicks' death makes witnesses more or less credible, or why.  Thus the relevance of this evidence is attenuated.

In his declaration, Berry states:

> The prosecutor adduced evidence that Randy "Bone"
> Hicks was murdered in February, 2004 -- just months
> prior to the trial.  In my view, this evidence
> possessed limited relevance and its introduction
> could have been taken to mean that Baldwin had
> something to do with Hicks' murder.  The purpose of
> the evidence, as I viewed it at the time, was to
> demonstrate why Hicks was not a witness.  I did not
> view it as contrary to the interests of my client.

Berry Dec. at ¶ 10.

Respondent interprets defense counsel's statement to mean that he did not ask for a limiting instruction to avoid drawing further attention to Hicks' fear of reprisal.  Counsel says nothing of the kind.  As counsel makes plain in his statement, he did not object because he did not view the evidence of Hicks' murder to be damaging to Petitioner's defense and he thought evidence of Hicks' death explained his absence as a witness.  If Hicks' failure to testify had to be explained, counsel could have stipulated that Hicks was unavailable.  Apparently, defense counsel did not appreciate the prejudice caused by the combination of Gaines' unrebutted double hearsay statement that Hicks said Petitioner was the shooter, that Hicks said he was afraid that Petitioner might kill him and the fact that Hicks was killed a few months before Petitioner's trial.  Counsel's failure to request an instruction to limit the effect of this prejudicial testimony supports the claim of ineffective assistance of counsel.

On a related point, Petitioner argues that defense counsel was deficient for failing to introduce evidence that Hicks had told the police that Zachery's shooter was someone he did not know, and that he knew Petitioner.  Therefore, Petitioner had no reason to want Hicks killed.  Respondent does not address this argument.  Petitioner's trial counsel states:

> I did not attempt to introduce evidence that the statements Randy Hicks had given the police were actually exculpatory of Mr. Baldwin, nor that Hicks and Baldwin had always been close friends.  At the time, the effort to introduce such evidence would have appeared peripheral to the issues of the trial.

United States District Court
For the Northern District of California

30

United States District Court
For the Northern District of California

Berry Dec. at ¶ 14.  Counsel's failure to present this evidence to counter the inference that Petitioner had had Hicks killed supports Petitioner's claim of ineffective assistance of counsel. Counsel's explanation that the issue was peripheral does not amount to a strategic decision.

c. "Star Chamber" Statement

Petitioner argues that the prosecutor's statement, in his closing argument, that Petitioner "conducted his own star chamber, including intimidating and terrorizing witnesses including to this day," RT 1168, was improper because it amounted to an unsupported representation that Petitioner personally participated in or instigated threats against or intimidation of witnesses.  It implies that such acts showed consciousness of guilt, an impermissible purpose absent evidence of Petitioner's involvement, rather than an unexplained effect on the credibility of witnesses. Petitioner also contends that counsel should have objected to this comment and requested an instruction explaining the relevance of the evidence of third party threats.  The state appellate court correctly stated that the prosecutor's remark "could be construed as suggesting that defendant did personally participate in or authorize threats or intimidation of witnesses, and was objectionable on that basis."  People v. Baldwin, No. A107665, slip op. at 37.

However, the court held that the prosecutorial misconduct claim was waived because defense counsel did not object.  It also concluded that counsel's failure to object was not ineffective because the prosecutor's comment "may have been a reference to defendant's statement in the recorded call about some 'snitching'

31

and asking the third party to 'handle' it.  Rather than risk underscoring the point, it was within the range of reasonable competence to elect instead simply to remind the jury in his own argument that arguments of counsel are not evidence."  Id. Respondent argues that the "star chamber" comment was isolated and ambiguous and that counsel's decision not to object to it or to request a limiting instruction was strategic.

Nonetheless, these facts support the claims of prosecutorial misconduct and ineffective assistance of counsel.

### d. Misrepresentation that Thigpin and Fudge Were Afraid

Petitioner contends that the prosecutor, in his closing argument, misstated the evidence relating to the credibility of defense witnesses Thigpin and Fudge, and defense counsel did not object.

In his cross-examination of Thigpin and Fudge, the prosecutor repeatedly suggested that they were testifying for Petitioner out of fear for their lives.  Both witnesses repeatedly denied this, RT 967-69 (Fudge) and 995-96, 1005-06 (Thigpin), although they agreed that someone who identified a murderer could be in danger. In his closing argument, the prosecutor stated, "Aaron Thigpin would not have made it home alive, he said, if he saw Wesley Tucker with the defendant on this day.  Jermaine Fudge would not have made it home alive, if I [sic] saw someone like the defendant who did this killing."  RT 1184.  Defense counsel did not object to these statements.

The state appellate court concluded that the prosecutor's statements fell on the side of permissible argument for reasonable inferences from

> Thigpin's testimony, in response to a hypothetical question, [] that he personally believed his life would be in danger if he identified a person responsible for a murder. . . . The prosecutor's use of the phrase "he said" logically referred to Thigpin's admission that he believed he would be killed if he identified a person responsible for the murder.

People v. Baldwin, No. A107665, slip op. at 19-20.

Similarly, in regard to Fudge, the court found that the

> injection of the pronoun "I" was a rhetorical device the prosecutor used to portray what Fudge might be thinking.  The prosecutor was clearly suggesting to the jury that it could infer Fudge shared the same fear that Thigpin acknowledged, and that is why Fudge testified he saw a person firing shots but could not identify the shooter, except to say with certainty that the person was not defendant.

Id. at 20.  Therefore, the state appellate court held that counsel was not ineffective for failing to object.

Because the prosecutor had repeatedly tried and failed to get these witnesses to admit that they were fearful about testifying against Petitioner, he knew that he was misstating the witnesses' testimony.  Therefore, his remarks amount to prosecutorial misconduct.

Explaining his failure to object, defense counsel declares, "These statements were mere speculation on the part of the prosecution and I did not object to these misstatements of the record evidence.  I generally rely on the jury to be critical of what both sides say about the evidence."  Berry Dec. at ¶ 19.

Respondent argues that counsel's statement shows that he made a tactical decision not to object.

Because Petitioner's defense rested heavily upon the credibility of these two witnesses and the prosecutor's statements misrepresented what the witnesses said, counsel's decision not to object supports the claim of ineffective assistance of counsel.

### 3. Character Attacks on Defendant and Defense Witnesses

#### a. Taped Conversations with Aldridge

Petitioner argues that the prosecutor was allowed to introduce his taped jailhouse conversations with Aldridge which did not pertain to Zachery's murder, but tended to make Petitioner look despicable in the eyes of the jury.  Although defense counsel objected to the admission of the tapes, Petitioner contends that defense counsel was ineffective for failing to ask for an instruction limiting the jury's consideration of the evidence only for its proper purpose, and to object to the prosecutor's prejudicial use of this evidence.

The trial court allowed the jury to hear the tape of one entire telephone conversation and portions of the second conversation between Petitioner and Aldridge.  The conversations consisted primarily of Petitioner insulting and verbally abusing Aldridge, mostly in response to her accusations of his infidelity. Petitioner repeatedly referred to Aldrich as a "bitch," a "stupid-ass woman," a "ho" and a "nigger," and berated her for opening her "motherfucking mouth."  The prosecutor used Petitioner's pejorative statements in cross-examining Petitioner and Aldridge. The prosecutor himself even referred to Aldridge as a bitch.  RT 843.  Petitioner argues that these portions of the tape caused the

jury to think that he was revolting and a misogynist and, thus, the type of person who could commit murder.

Petitioner contends the prosecutor committed misconduct when cross-examining him about what he meant when he referred to the "low-term 25" in his telephone call from jail to Aldridge. Petitioner testified that he was warning that she could receive the low term of three years for marijuana sales, not a term of twenty-five years to life for murder. The prosecutor replied that "there's no crime in the Penal Code that you get low term of 25." RT 1108. After Petitioner insisted he was referring to a marijuana charge, the prosecutor stated, "You know the truth of this. Don't deceive the jury. You know low term is two years, and you got credit for time served for anything else. You know that, don't you?" RT 1123-24. The court sustained the defense objection and told the jury to disregard the prosecutor's comments.

The state court denied Petitioner's prosecutorial misconduct claim based on this statement, finding that, although the form of questioning was improper, Petitioner was not prejudiced because the court sustained an objection and told the jury to disregard the improper comments and the prosecutor later introduced evidence that Petitioner had been sentenced to two years for a marijuana sale.

The appellate court's conclusion that the questioning was improper but not prejudicial was not unreasonable, but the prosecutor's impropriety is consistent with his misconduct throughout the trial, and contributes to a cumulative finding of prejudice.

Prior to trial, the court held a hearing on defense counsel's motion, under California Evidence Code section 352, to exclude the taped phone conversations on the ground that their probative value was outweighed by the probability that their admission would create substantial danger of undue prejudice or of confusing the issue. RT 1-45.  The court redacted only some statements in the second conversation, and only because they were repetitive.  RT 66-69.  The state appellate court concluded that the trial court did not abuse its discretion by admitting the bulk of the taped conversations, noting that, throughout the conversations, Petitioner made incriminating statements that were interspersed and intertwined with his argument with Aldridge, so that most of the tape had probative value.  The court also determined that Petitioner's words were not likely to shock or inflame the jury because other witnesses used similar language and the trial took place in an urban setting.  The court explained that the trial court had no sua sponte duty to give a limiting instruction, and counsel never requested one.  The court did not address whether defense counsel's failure to request a limiting instruction constituted ineffective assistance.

Trial counsel admits that he should have requested a limiting instruction as to the purpose for which the jury could consider the pejorative statements in the phone conversation, but did not because he thought "that evidence was just a diversion from the real facts of the case."  Berry Dec. at 9.

More of the offensive irrelevant language could have been redacted.  This evidence contributed to the unfairly prejudicial effect of the prosecutorial misconduct and of the evidence

received without limitation to its purpose.  Defense counsel's failure to ask for a limiting instruction supports the claim of ineffective assistance of counsel.  See Garceau v. Woodford, 275 F.3d 769, 776 (9th Cir. 2001) rev'd on other grounds, 538 U.S. 202 (2003) (the only way to mitigate harm of drawing propensity inferences from other acts evidence is to give limiting instruction to jury).

### b. Improper Cross-Examination

The relevant inquiry on a habeas claim of improper cross examination is that dictated by Darden, 477 U.S. at 181, i.e., whether the prosecutor's behavior so infected the trial with unfairness as to make the resulting conviction a denial of due process.  Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998).  In considering whether the questioning deprived the defendant of a fair trial, the witness' testimony should be viewed as a whole to determine the impact of the improper questioning.  Id. at 934-35.

### (1) Mocha Aldridge

The prosecutor established that Aldridge was aware in April 2003 that Petitioner had been charged with murder, but did not immediately come forward to tell the police or the prosecutor that she was with Petitioner on the day of the murder.  He brought out that she had given her calendar, in which she kept a record of her daily activities, and a statement, to the defense investigator in 2003.  The prosecutor then stated, "The record should reflect that I didn't receive any knowledge of this until I got a letter" from defense counsel shortly before the trial began.

The appellate court held that statements by attorneys are not evidence and defense counsel should have objected on this ground,

but did not.  The court then held that counsel's failure to object did not constitute deficient representation because this issue was not critical but was collateral to the prosecutor's proper line of questioning regarding Aldridge's failure to disclose Petitioner's alibi before the trial.  The state court was correct that the prosecutor's comment was improper and counsel should have objected.  While these errors alone do not amount to prosecutorial misconduct or ineffective assistance of counsel, they contribute to such findings.

### (2) Deborah Baldwin

Petitioner asserts that, during the cross-examination of Deborah Baldwin, the prosecutor made testimonial statements in the form of argumentative questions that conveyed his personal belief that she lied to him and intentionally concealed key facts from him.  When questioning Deborah Baldwin about her delay in informing the authorities of Petitioner's alibi, the prosecutor stated: "No, No. If my kid were locked up for murder, and he was with me, I'd go to the police officer and say, 'Hey, my kid was with me.  He couldn't have done it.'  Why didn't you do that?"  RT 915-16.  The court sustained the defense objection to this remark.  Later the prosecutor stated to Deborah Baldwin, "You lied to me when you said you rented the car."  A defense objection was overruled.  The prosecutor continued to refer to his own actions in his cross-examination of Deborah Baldwin until the court admonished him not to testify.  RT 926-27.

The state appellate court acknowledged that the prosecutor became argumentative and made assertions of fact instead of asking questions, but concluded that the prosecutor's conduct did not

prejudice Petitioner because the court sustained all but one of the defense objections and because the improper statements did not inform the jury of facts that it did not already know.  The court also surmised that the jury would not have construed the prosecutor's comments "as a statement of his personal belief that Baldwin lied . . . [but] would have recognized that he was using cross-examination aggressively to expose the inconsistencies in her testimony, and to impeach her credibility."  People v. Baldwin, No. A107665, slip op. at 14.  The state court was correct that the prosecutor's conduct was improper.  While these comments alone did not amount to prosecutorial misconduct, they support such a finding.

4. Prosecutor's Closing Argument

If a prosecutor makes statements to the jury during closing argument that he knows are false or has strong reason to doubt, with respect to material facts on which the defendant's defense relied, this is misconduct.  United States v. Reyes, 577 F.3d 1069, 1078 (9th Cir. 2009).

a. "Crack an Alibi" Statement

Petitioner objects to the prosecutor's assertion, in closing argument, that it was not common to "crack an alibi like this," because there was no evidence regarding how common it was to "crack an alibi."  The remark amounted to telling the jury, based upon the prosecutor's own experience, that this was a strong case for the prosecution.  The state appellate court concluded that the prosecutor's statement did not concern a critical issue; the critical issue was that the prosecutor had presented overwhelming evidence undermining Petitioner's alibi.  The state court also

concluded that it was not ineffective for defense counsel to fail to object.

However, this statement by the prosecutor was improper and, because it was directed at a critical part of the defense case, supports a finding of prejudice.  For the same reason, defense counsel's failure to object supports the claim of ineffective assistance of counsel.

### b. Rental Car Records

Petitioner contends that the prosecutor committed misconduct during his rebuttal closing argument by stating, "You know, this irritates me to no end.  We checked every car that Cecilia Franklin rented.  We brought the one from July 2nd, and the one from June 19th.  There was nothing rented in between."  RT 1235. This was the prosecutor's response to defense counsel's closing argument that the prosecutor's evidence failed to establish that Franklin did not have a car rented from Enterprise as of July 1, 2001.  Petitioner argues that, to overcome the evidentiary gap left by the Enterprise employee's testimony that he had not been asked to check all the records for car rentals by Franklin, the prosecutor assured the jury, from his own knowledge, that the records had been checked for all possible Enterprise rentals to Franklin and that none was rented to her on the day of the homicide.

The state court assumed this remark constituted prosecutorial misconduct, but concluded that defense counsel did not provide ineffective assistance by failing to object, because an objection would have forced the prosecutor to restate his argument and focus on defense counsel's failure to present records that Franklin did

40

have a rental car on the day of the homicide.  The court's

conclusion that it was improper for the prosecutor to argue facts

not in evidence to make up for a gap in his case against

Petitioner was correct.  However, counsel's failure to object

supports a finding of deficient performance.  The prosecutor made

this remark in his rebuttal so, by failing to object, defense

counsel failed to point out to the jury the correct state of the

evidence.  A crucial element of the defense case rested on the

fact that Franklin had a rental car to loan to Deborah Baldwin on

the day of the homicide.  Because defense counsel had emphasized

in his closing that the prosecutor failed to prove that Franklin

did not have a car on that day, his failure to object to the

prosecutor's erroneous statement, that he had checked all of

Franklin's car rental records, left the jury with the impression

that the prosecutor was in possession of evidence that she did not

have a car on that day.

                    c. Misstatement of the Law on Alibi

     Petitioner contends that the prosecutor, in his closing

remarks, improperly asserted that the jurors were required to find

Petitioner guilty if they did not believe the alibi witnesses.

The prosecutor stated, "If you believe this alibi is a lie, is

untrue, you have to find him guilty," RT 1176-77; "If you believe

this alibi is false, you must find him guilty, and it is clearly

false," RT 1209; "And ladies and gentlemen of the jury, this all

boils down to these two witnesses and this false alibi.  And

innocent people don't come up with these false alibis.  That alone

is enough--that alone is enough to convict him."  RT 1250.

Defense counsel did not object to any of these remarks.

**United States District Court**
For the Northern District of California

Petitioner argues that these statements misstated the prosecutor's burden of proving guilt beyond a reasonable doubt.

The state court concluded, "There was no reasonable likelihood that the jury would have construed this, and similar remarks throughout the prosecutor's closing, in the manner defendant suggests. . . . Read as a whole, it is obvious that the prosecutor was not purporting to state the law. Rather, he was making a factual argument." Because the court found that this did not constitute prosecutorial misconduct, the court also found that counsel was not ineffective for failing to object.

The prosecutor's statement was incorrect. Because he said it three times, it supports a claim of prosecutorial misconduct. Defense counsel's failure to object supports a finding of deficient performance.

### d. Benefits to Tucker and Gaines

Petitioner contends that the prosecutor improperly informed the jury that Tucker and Gaines would not, under Proposition 36, have faced long prison sentences for possession of drugs if they had not cooperated. There was no evidence of what their sentences would be under Proposition 36, or that these witnesses would only do "days or weeks" or "months in jail here and there," but not years. RT 1182, 1195 (closing argument). The state appellate court concluded that,

> assuming arguendo that the description was inaccurate, it was not incompetent to fail to object. The prosecutor's argument merely minimized the degree of penal consequence these witnesses faced, but it did not undermine defense counsel's basic point that they both faced incarceration, and admitted that they gave information concerning the killing of Terrill Zachery in the hope of gaining their freedom.

People v. Baldwin, No. A107665, slip op. at 16.

Thus, the state court did not rule on whether the prosecutor committed misconduct.  The prosecutor's comments were consistent with his misconduct throughout the trial and support a finding of prejudice.  Counsel's failure to object supports a finding of deficient performance.

Evidence of lenient treatment by the prosecutor in exchange for testimony incriminating a defendant provides strong support for the inference that the witness testified in order to curry favor with law enforcement.[6]  Davis v. Alaska, 415 U.S. 308, 317-18 (1974) (important for jury to know of witness' vulnerable status as a probationer and possible bias, based on an inference of undue pressure from prosecution); Alford v. United States, 282 U.S. 687, 693 (1931) (that witness was in custody of federal authorities could show bias based on promise or expectation of immunity or coercive effect of detention); Burr v. Sullivan, 618 F.2d 583, 586 (9th Cir. 1980) (defense must be allowed to cross-examine witnesses about juvenile offenses to show motivation for cooperation with district attorney).

Trial counsel states:

I am not sure if the prosecutor's arguments regarding the potential consequences for Tucker and Gaines were accurate.

_____

[6] In support of his traverse, Petitioner submits information about the charges against Tucker and Gaines.  At the time of the trial, Tucker was on probation for a drug felony committed in Alameda County.  On September 26, 2003, Tucker had been arrested in Ohio for a drug felony.  On December 4, 2001, a warrant was issued for Gaines for a drug felony.  On February 20, 2002, Gaines was placed on probation for a period of thirty-six months following conviction of the drug felony.

> In any event, I did not object to it, nor did I try to contradict it in my own argument.  In my view, it was a peripheral issue that did not have much to do with the credibility of those witnesses.

Berry Dec. at ¶¶ 2 to 5.

Given that the prosecutor's case depended on the credibility of Tucker and of Gaines' original statement and given that their potential sentences would have a strong impact on their credibility in the eyes of the jury, the prosecutor's unproven speculation about their potential sentences, and counsel's failure to object to it, support findings of prosecutorial misconduct and deficient performance.

### 5. Representations of Facts Not In Evidence

Petitioner argues that, during voir dire, to explain away the primary weakness in his case, the prosecutor improperly stated as a fact that most murder cases have no eyewitnesses.  A prosecutor's improper suggestions, insinuations and assertions of personal knowledge are apt to carry much weight and may cause such prejudice as to rise to the level of a constitutional violation. United States v. Williams, 504 U.S. 36, 60-61 (1992) (citing Berger v. United States, 295 U.S. 78, 84-85 (1935)).

The state appellate court found that the prosecutor made this statement as a prelude to inquiring whether the prospective jurors would have difficulty basing a decision on circumstantial evidence in the absence of eyewitness testimony.  The court found that, because this was an appropriate line of inquiry during voir dire, it was not ineffective for defense counsel to fail to object.  The state court's finding was not unreasonable.

Petitioner also argues that there was no evidence to support the prosecutor's assertion in his opening statement that unnamed

witnesses did not want to testify and that, when cases come to court, family members from both sides report back on the street what is happening.  The state court noted that there was evidence that Gaines refused to testify at Petitioner's preliminary hearing because he was told that fifteen to twenty members of Petitioner's family were present in the courtroom, and that Tucker's family had been told to warn him against testifying.  Therefore, the state court found that there was evidence to support the prosecutor's statement.  This finding was not unreasonable.  These facts do not support a finding of prosecutorial misconduct or ineffective assistance of counsel.

    6. Vouching

  Petitioner argues four instances when the prosecutor improperly vouched for his witnesses, as follows: (1) in his opening statement, the prosecutor described Sergeant Medeiros as "one of Oakland's finest homicide detectives;" (2) in his closing argument, the prosecutor said, "I met Wesley Tucker in Santa Rita jail on May 10, 2004, and he essentially told me the same thing in the presence of Inspector Pat Johnson;" (3) with respect to deals made by the witnesses, the prosecutor stated, "Everything is open. I have never in any way deceived you;" and (4) the prosecutor stated, "I have tried to bring you all the witnesses that I can." Defense counsel did not object to any of these statements.

  Improper vouching for the credibility of a witness occurs when the prosecutor places the prestige of the government behind the witness or suggests that information not presented to the jury supports the witness's testimony.  United States v. Young, 470

U.S. 1, 7 n.3, 11-12 (1985); <u>United States v. Parker</u>, 241 F.3d 1114, 1119-20 (9th Cir. 2001).

The state appellate court found that "none of these comments were reasonably likely to have been understood as vouching, and it therefore was not ineffective for counsel to fail to object."  The statements about Sergeant Medeiros and Tucker constituted vouching.  These two statements support the claim of prosecutorial misconduct and counsel's failure to object to them supports a finding of deficient performance.

In sum, viewed as a whole, the prosecutor committed misconduct and defense counsel's performance was deficient. However, these findings will not afford relief unless Petitioner was prejudiced by them.  The Court now turns to this question.

II.  Prejudice From Prosecutorial Misconduct and Ineffective
     Assistance of Counsel

     A.  Ineffective Assistance of Counsel

To determine prejudice from ineffective assistance of counsel, the appropriate question is "'whether there is a reasonable probability that, absent [counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt.'" <u>Luna v. Cambra</u>, 306 F.3d 954, 961 (9th Cir.) (quoting <u>Strickland</u>, 466 U.S. at 695), <u>amended by</u> 311 F.3d 928 (9th Cir. 2002).  If the state's case is weak, there is a greater likelihood that the result of the trial would have been different, and vice versa. <u>Luna</u>, 306 F.3d at 966-67.  "'[P]rejudice may result from the cumulative impact of multiple deficiencies.'"  <u>Harris v. Wood</u>, 64 F.3d 1432, 1438 (9th Cir. 1995).

**United States District Court**
For the Northern District of California

Because the state appellate court denied Petitioner's ineffective assistance of counsel claims, finding that counsel's performance was not deficient, it did not address the second prong of the <u>Strickland</u> test, whether counsel's deficiencies resulted in prejudice.  Therefore, the Court undertakes an independent review of the record to determine if the result was contrary to, or an unreasonable application of, Supreme Court authority or an unreasonable determination of the facts in light of the evidence.

Petitioner argues that this is a close case which amounted to a credibility contest between prosecution witness Tucker and Gaines' original statement on the one hand, and the exculpatory testimony of Thigpen, Fudge and Tapia on the other.  Respondent counters that the prosecutor's case was strong, with Tucker and Gaines implicating Petitioner as the shooter and corroborating each other, even though they were interviewed by the police on separate occasions and had no significant connection to each other.

The Court finds that the case was close and, therefore, there was a reasonable probability that, but for the prosecutorial misconduct and counsel's deficient performance by failing to object, seek curative instructions and take action regarding critical aspects of the defense, the result of the trial would have been different.

Significantly, there was no physical evidence linking Petitioner to the scene of the crime, no confession and, except for the taped police interview of Gaines in which he relayed hearsay statements from Hicks, no eyewitness identification of Petitioner as the shooter.  Gaines' statement was subject to doubt

because, at Petitioner's preliminary hearing, he recanted what he told the police, saying that he told the police what they wanted to hear.  Furthermore, because Gaines never testified, either at the preliminary hearing or at the trial, he was never cross-examined by defense counsel.

Tucker, the most important prosecution witness, had something to gain by testifying because he had a pending probation violation.  The fact that the prosecutor improperly suggested Tucker was only facing weeks or months in jail, rather than years, minimized to the jury Tucker's incentive to testify for the prosecution.

Respondent's primary argument, that the prosecutor had a strong case because Tucker and Gaines' original statement corroborated each other, is undermined by the fact that Gaines recanted by testifying at Petitioner's preliminary hearing that, in his taped statement to the police, he only told them what they wanted to hear.

In addition to the testimony of Tucker and Gaines' statement, the prosecutor presented evidence of the two telephone conversations between Petitioner and Aldridge and the cell phone calls to Aldridge's home telephone number from Tucker's phone on the night of the murder.  The incriminating interpretation of the taped telephone conversations depended largely on the prosecutor's theory that Petitioner, who was arrested for possession of marijuana and a parole violation, could not have known that he was being investigated for a homicide, and thus would not have repeatedly mentioned the homicide squad to Aldridge unless he had committed the murder.  However, Officer Midyett, a police officer

who had been prominent in the search and arrest of Petitioner on the marijuana and parole violation charges, was known in the community for his work as a homicide officer.  RT 845 (Aldridge's testimony); 1034 (Petitioner's testimony).  The trial judge also commented that he thought of Officer Midyett as a homicide officer.  RT 32 (motion to suppress tape of jail telephone calls). Furthermore, the importance of the tapes turned on the prosecutor's interpretation of ambiguous and cryptic words and phrases such as "bizat," "low term 25" and "handle this shit." The fact that a large sign over the jail telephone informed inmates that their conversations were being recorded, RT 695, made it unlikely that Petitioner would discuss inculpatory information about a murder he had committed over the telephone.

Furthermore, the cell phone records that showed that two short calls were made from Tucker's cell phone to Aldridge's home on the night of the murder did not indicate who made the calls and who received them.  Tucker could have placed the calls to Petitioner, who lived at Aldridge's home.  Furthermore, after Petitioner allegedly made a call to Aldridge on Tucker's cell phone, the woman who Tucker said brought Petitioner his gun was another girlfriend, not Aldridge.

On the defense side, although Thigpen and Fudge were Petitioner's friends, Tapia was a neutral witness.  The prosecutor's effort to impeach Thigpen and Fudge by showing that they were testifying because they were afraid of Petitioner was unsuccessful.  The separate descriptions of the actual killer, by Fudge and Tapia, corroborated each other because they both described him as thinner and shorter than Petitioner.  These

descriptions of the perpetrator are consistent with the security guard's description of the man found in possession of the murder weapon as tall and lanky; Petitioner weighed 230 pounds.  This is strong exculpatory evidence.

Petitioner presented an alibi with corroborating witnesses. The prosecutor's attempt to show that Petitioner's alibi was untrue based upon rental car records was incomplete.

The substance of trial counsel's deficient performance was directly relevant to the areas of weakness of the prosecutor's case.  The most egregious aspect of deficient performance was counsel's failure to object to the prosecutor's closing argument that appealed to the jury's passion and prejudice regarding crime in Oakland, that Petitioner was running a "star chamber" by threatening and intimidating witnesses, that implicated Petitioner in the killing of Randy Hicks, that the jury must convict Petitioner if it disbelieved his alibi defense, and that misstated the evidence regarding the rental car records, the possible sentences faced by prosecution witnesses Tucker and Gaines and the testimony of Thigpen and Fudge.

Given the closeness of the case and the cumulative impact of the multiple errors by counsel, see Harris, 64 F.3d at 1438, there is a reasonable probability that, absent counsel's deficient performance, at least one member of the jury would have had a reasonable doubt respecting Petitioner's guilt and he would not have been convicted.  Thus, Petitioner has established his claim of ineffective assistance of counsel.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

B. Prejudice From Prosecutorial Misconduct

The state appellate court held that many of Petitioner's prosecutorial misconduct claims were procedurally defaulted. Although the court addressed these claims, it did so in the context of ruling on Petitioner's ineffective assistance of counsel claims. A habeas court may review claims of prosecutorial misconduct if the petitioner can show cause for the default and actual prejudice as a result of the alleged violation of federal law. Vansickel, 166 F.3d at 958. Because Petitioner's counsel was ineffective, he has shown cause for the procedural default of his claims of prosecutorial misconduct. See Murray, 477 U.S. at 488; Vansickel, 166 F.3d at 958. To show prejudice as a result of prosecutorial misconduct, a petitioner must show that the misconduct had a substantial and injurious effect or influence in determining the jury's verdict, Brecht, 507 U.S. at 637-38, and that the trial was infected with unfairness, Darden, 477 U.S. at 181.

As discussed above, the case against Petitioner was close. The ongoing pattern of prosecutorial misconduct related to critical parts of the case. That the prosecutor made many of these inflammatory comments during his closing argument and rebuttal magnified their prejudicial effect because they were fresh in the mind of the jurors. Because of the closeness of the case and the prejudicial effect of the prosecutor's misconduct, the Court concludes that the misconduct had a substantial and injurious effect on the jury's verdict and that the trial was infected with unfairness. To the extent that the state court found that the prosecutor's misconduct was not prejudicial, the

ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Therefore, Petitioner has established his claim of prosecutorial misconduct.

III. Failure to Investigate Jury Tampering

Petitioner argues that his rights to an impartial jury and due process were violated because, after learning of possible jury misconduct, the trial court failed to make an adequate inquiry.

This claim arises from an out-of-court conversation Juror Number 8 had with the victim's mother.  In the hallway, during a break in the trial, the victim's mother said to Juror Number 8, "He killed my son, he was my son."  Juror Number 8 replied, "I'm sorry."  The mother then said, "He was twenty-five, no twenty-four."  An alternate juror was also in the hallway and in a position to hear the exchange.

The trial court held a hearing with the parties and Juror Number 8.  The court asked the juror whether the conversation would affect her decision as a juror and she responded, "[T]here was nothing discussed about that . . . [N]o I don't have a problem with that, because no detail was discussed or anything like that." Defense counsel did not request that Juror Number 8 be replaced with an alternate, but he did move for a mistrial, which the court denied.  The court decided not to question the alternate juror about what he had overheard because "the content of the communication was relatively innocuous."  Defense counsel did not request that the alternate juror be questioned and did not move that the alternate be replaced.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors.  U.S. Const. amend. VI; Irvin v. Dowd, 366 U.S. 717, 722 (1961).  "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury."  Tinsley v. Borg, 895 F.2d 520, 523-24 (9th Cir. 1990).  "[P]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear."  Mattox v. United States, 146 U.S. 140, 142 (1892).  Mattox establishes the presumption that an unauthorized communication with a juror is prejudicial.  Caliendo v. Warden of California Men's Colony, 365 F.3d 691, 697 (9th Cir. 2004).  Mattox's "presumption is not conclusive, but the burden rests heavily on the Government to establish . . . that such contact with the juror was harmless to the defendant."  Remmer v. United States, 347 U.S. 227, 229 (1954).  "[I]f an unauthorized contact with a juror is de minimis, the defendant must show that the communication could have influenced the verdict before the burden of proof shifts to the prosecution."  Caliendo, 365 F.3d at 696.

In determining whether an unauthorized communication raised a risk of tainting the verdict, courts should consider factors such as whether the unauthorized communication concerned the case, the length and nature of the contact, the identity and role at trial of the parties involved, evidence of actual impact on the juror, and the possibility of eliminating prejudice through a limiting instruction.  Id. at 697-98 (critical prosecution witness's unauthorized conversation with multiple jurors for twenty minutes

was possibly prejudicial under Mattox, even if conversation did
not concern the trial).

Petitioner argues that the improper communication in this
case was not de minimis, the trial court's hearing was extremely
brief and the court never asked Juror Number 8 "whether she
perceived the conversation as containing an implicit threat or
plea to decide the case based upon sympathy" for the victim and
the victim's mother.  Petitioner also argues that the trial court
erred by not undertaking any investigation of the impact of the
conversation on the alternate juror and, thus, in regard to the
alternate juror, the presumption of prejudice is unrebutted.

The state appellate court denied this claim, determining

> that the presumption of prejudice was dispelled
> with respect to Juror No. 8 because she did not
> describe or perceive the conversation as containing
> any implicit threat, or plea to decide the case
> based upon sympathy.  Nor did she interpret the
> comment 'he killed my son' as an assertion that the
> victim's mother had information not presented to
> the jury that established defendant's guilt.  She
> unequivocally stated her understanding that the
> conversation did not relate to her decision in the
> case, and expressed certainty that the conversation
> would not affect her ability to be impartial.

People v. Baldwin, No. A107665, slip op. at 42.

The state appellate court also found that the presumption of
prejudice regarding the alternate juror was rebutted based upon
California law.  The court determined that the comments made by
the victim's mother, judged objectively, did not convey the type
of information that was inherently and substantially likely to
have influenced the jurors.  The court determined that there was
no substantial likelihood that actual bias arose.

United States District Court
For the Northern District of California

      The appellate court's determination was not unreasonable. Not only was the content of the mother's remark non-prejudicial, but the contact was brief and the trial court's inquiry of Juror Number 8 was sufficient to dispel any presumption of prejudice. Because the alternate juror was only a bystander, he would likely be less influenced by the remarks than Juror Number 8, to whom the remarks were directed.  The state court's denial of this claim was not contrary to or an unreasonable application of established federal law or an unreasonable determination of the facts in light of the record evidence.

                                CONCLUSION

      Based on the above, the Court's confidence in the outcome of Petitioner's trial is undermined by the ineffective assistance of counsel and prosecutorial misconduct.  Therefore, Petitioner's petition for writ of habeas corpus is granted and his motion for an evidentiary hearing is denied as moot.  Petitioner's conviction is vacated and Respondent is ordered to release him from custody within sixty (60) days of the date of this order unless the State of California reinstitutes criminal proceedings against him.  If Respondent appeals this decision, Petitioner's release or retrial shall be stayed pending appeal.


      IT IS SO ORDERED.


Dated: 8/29/2012

                              _____
                              CLAUDIA WILKEN
                              United States District Judge